Today we're going to start with 22-107, United States of America v. Grifols USA. Thank you. Good morning. May it please the court, Monique Olivier on behalf of the later Alan Timothy Yu on behalf of the United States. The district court erred in this case by dismissing the well-pleaded complaint that was 169 paragraphs over 60 pages. And this court, in reviewing the matter de novo, should reverse. The district court failed to credit the allegations in the relator's complaint and also misapplied the materiality analysis under Escobar. The relator has an obligation to plausibly state a claim for relief. The Oxford Dictionary defines plausible as seemingly reasonable or able to be believed. And this court has found in applying the 9b standard that we don't require evidentiary certainty. Instead, we look at the fraudulent statements that were made, who made them, what the circumstances were and why they were fraudulent. All of those allegations are contained well within the confines of the complaint. So can I ask about that? Absolutely. So I want to make sure I understand your theory. One component, at least, of your theory is that there were affirmative misrepresentations that were fraudulent. And were those in the final validation report that were relevant to the FDA's approval or were there other affirmative misrepresentations that fall into that category? So there's sort of, I would say, a stream of misrepresentations. The initial misrepresentations take place at the plant level when the engineers are, as the relator alleges, are falsifying the reports that get submitted to the FDA. Okay, but one of the things that was confusing to me about the complaint is the FDA, there's an allegation that the FDA had access to the final validation report. There were a whole bunch of allegations about things that happened before that time. The hundred discrepancies. Those, were those discrepancies, is there an allegation that all hundred of those were communicated to the FDA or only the ones that remained as of the time of the final validation report? I don't believe we know that at this point, Your Honor. What we do know is that that information was contained in, the falsification was contained in part of the audit submission to the FDA when they went to audit the plant prior to approving. But the allegation as to the final validation report was, I later saw it in the course of the subsequent litigation and I noticed that the discrepancies with respect to CPL, I'm going to make up the numbers, six, nine, and 15 were still there. So what I was trying to figure out is whether that means all these other allegations of discrepancies weren't still there because. I don't, I don't believe that the court can infer that at this stage in the proceedings. This is a motion to dismiss. All inferences go to the relator. So what we do know, based on the fact that there was a civil trial with respect to Mr. Yu's wrongful termination and in that trial, we know that there were representations of fraud that were part of what the FDA had seen. We don't know the extent of. What are the allegations as to materiality, assuming there were omissions and misrepresentations? So the allegations supporting materiality take a couple of different forms. What we know from the regulations and from the allegations in the complaint are that the plant has to comply, the LA plant had to comply with the good manufacturing practices, the CGMP regulations. That is required for FDA approval. So that is a prerequisite for FDA approval. So if there is fraud in the compliance documentation, which is what Mr. Yu alleges, then that means that the. It sounds like the argument is because the FDA approved, they must have been misled. It's. I mean, part of the issue of course is that the case has been pending for four or five years. The government has investigated. There were approval processes all along, not just in the beginning, but you know, the operations, the performance, the government is still, the FDA is still paying. So let me break that down because there are a couple of different issues that are tied up in that. First of all, we have to sort of look at, and these are the laws laid out very clearly in the complaint. If, if the CGMP regulations are not met as a matter of law, any drug that is produced pursuant to that, those drugs are adulterated as a matter of law. Let me, let me interject for just a minute though. The CGMP regulations are, encompass a lot of activity, a lot of machines, a lot of reports, you know, from, would you concede that some failures to conform to CGMP might be immaterial? Absolutely, Your Honor. We're not suggesting that it, and there's a lot of talk in Griffith's brief about the yellow peeling tape. Obviously if you're talking about a super minor violation of the CGMP regulations, there may be a situation where the FDA has knowledge of that and approves, you know, approves the plant anyway. That's not the situation. We have very detailed facts of a variety of... For example, one of your allegations was about a joint being welded or not welded as opposed to using a three joint clamp, something like that. I find it difficult to understand why that would necessarily be material given the scale of operation here, particularly where the allegations of harm is that something could end up causing contamination or could, you know, cause harm in another way or adulteration that you were just discussing. So the plant has these clean in place, these CIC machines, and that is where, that's what the project manager over the validation. These are very sophisticated machines producing a very sophisticated pharmaceutical drug for a very vulnerable patient population. Every single point matters. And what Mr. Yu was able to document was that there was falsification for a number of different issues, which together look like there could be, if there was not a way that the drugs are made. And that principally goes to the way that it was, the machines were being cleaned. There's sort of these self-cleaning machines, and there's all this chemical, chemicals that flow through it. So the rate of flow, the type of material that's being cleaned, all of that is very carefully calibrated. And that's why those regulations exist, to make sure that we don't have adulterated materials that are being produced. This goes back to the specificity of the complaint that I'm struggling with, because in order to evaluate materiality, like how big a deal are these, we kind of have to know what the specific allegations are, not that there were widespread violations of CGMDs, but what they were. And you've got the hundred discrepancies at kind of an earlier stage in the process. We know that there was some response to that, and then we have the actual validation report provided to the FDA. And the only specifics we have about that is that the allegations related to CIP 3, 5, and 9 are still there. How can we, especially given the fraud cleaning standard, infer that anything other than the ones that are specifically documented as being part of what was presented to the FDA are even, A, still in existence as problems, and B, representations to the FDA? Because we're dealing with fraud allegations, it's exactly that. So what the complaint alleges is that the whole host of those hundred did eventually end up in front of the FDA, and that was a falsification in order to get the LA plan approved. So those allegations are still there, and then the other thing I want to mention, too, is the fact that at Mr. Yu's civil trial, the vice president of R&D for Griffles himself testified that if there was not compliance with the CGMD regulations of the type that Mr. Yu had complained about and was fired for, that that created a risk of patient harm. And then I think you link back to the fact that adulterated drugs, if they're adulterated as a matter of law, which they are if they don't go through that, if they're not validly approved by the FDA, which requires CGMP compliance. So if you, there is where, back to Your Honor's question, Judge Chen, that's where the materiality comes in. And it does matter which government entity you're talking about, because this notion that the FDA or the healthcare programs had actual knowledge is not supported by the allegations in the complaint. There is no evidence, and this court would have to find that the inferences went to Griffles and not to the relator in order to determine that there was actual knowledge of the violations here such that it would have made a difference, and the fact that there was continued approval or continued payment ended up being an issue. You can't even look at that in this case because there wasn't actual knowledge. I see that I'm beyond. And finally, I just want to make sure I understand the sort of legal theory, because for the false claims, you need misrepresentations or false claims to the payers. Correct. And so as I understand it, your theory is that there were misrepresentations to the FDA and slash or noncompliance that then led to FDA approval and nonwithdrawal of that approval, which in turn undermined the implicit representation to the payers that the FDA was on board with this process. That is correct, but I can make it a little bit more straightforward for you, which is if you look at the right paragraph, paragraph 62 of the complaint, that paragraph recites the Medicare provisions and the fact that CMS only pays for drugs that are not adulterated. So if they only pay for drugs that are not adulterated and Mr. Yu... Is that correct? I thought just because it's adulterated doesn't mean that it's unsafe. That's true. That is correct, Your Honor. And so, I mean, just because it's adulterated, isn't it possible that the FDA will still pay for it? No, Your Honor, because the law does not permit that. The FDCA and the Medicare guidance both state that you have to have FDA approval in order to have reimbursement, and you can't have FDA approval if the drug is adulterated as a matter of law, which it is in this case if you take the allegations as true. So that gets you there. You're right, Your Honor, you can get there the way that you suggested, and that is a theory that we advance, but I think that the district court, frankly, was a little bit confused about how the law works. And that theory that you just described in paragraph 62, I take it, only goes to the claims made to Medicare and Medicaid and doesn't go to TRICARE and the VA? No, because TRICARE and the VA have similar requirements. So that's also a complaint? Yes, so it's paragraph 62, 65, 76, 79, and 84 through 86, I would say, are the key paragraphs the court should look at. And I know I'm over my time. Appreciate it. We'll go back to the room. Thank you. Mr. Lockseaton. Good morning. I'd like to start by looking at the language of paragraph 62, which my friend just pointed you to. The way that Mr. Yu summarizes what Medicare will and won't pay for is, as my friend just told you, but what the actual regulatory materials say, and this is quoted in the complaint itself, is that Medicare does not pay if FDA determines that a required NDA has not been approved or that the drug is misbranded or adulterated. And that, I think, gets at the basic problem here. It is for FDA to determine whether it has been misled in a way that affects its approval, and if so, what, if anything, should be done about that. And I also think that a lot of the panel's questions highlighted some of the problems with Mr. Yu's legal theory, which is that he is really essentially trying to preempt or second-guess FDA's approval and enforcement processes. But isn't he saying, no, you misled the FDA, and that misleading sort of carries downstream to the consequences of that FDA approval? I think so, Your Honor. Frankly, I heard sort of two different versions of that theory during my friend's presentation. The first was an admission that not all CGMP violations are material, which is what the appellate briefs say. But then a couple of moments later, I think I heard that if a drug is adulterated, then as a matter of law, FDA cannot approve it and payors can't pay for it. So those theories, I think, are inconsistent. The broader one raises all of the problems that we emphasized in our appellate brief, which would extend even to the yellow peeling tape scenario. On the other hand, if you look at the narrower one, the question essentially becomes, who decides in the first instance whether FDA has been misled during the approval process? And the Supreme Court emphasized in Buckman that FDA has ample tools to detect, excuse me, to detect, deter, and to punish fraud aimed at its approval processes, and that in doing so, FDA... Are there any allegations in the complaint to show that the FDA had actual knowledge of the violations? No, Your Honor. We are not contending that FDA or the payor agencies have actual knowledge in the sense that Escobar uses that phrase, meaning actual knowledge of violations themselves. But it goes too far to suggest that FDA is in the dark here or that it simply had no idea what was going on. Mr. Yu brought this case five years ago now. It is undisputed that the Department of Justice investigated over the course of three years. Department of Justice regulations required the DOJ attorneys investigating the case to consult with FDA, including as to materiality. So I gather the FDA has continued to pay over the five years? Is that in the record? There are no allegations in the complaint, Your Honor, that FDA has taken any enforcement action, that it has withdrawn its approval, that it has issued a warning letter, nor are there any allegations that any government health care program has stopped paying, has canceled a contract, has refused to renew a contract, or has taken any other steps. And this Court's decisions... There's nothing in the record that says that the FDA has paid X millions of dollars, I gather? Well, so the complaint does allege, I think, total payment numbers over several years. I don't know that it breaks down when those payments were made. But this Court's decisions... I'm sorry, can I interrupt for just a second? My understanding is that it would be CMS that would be authorizing payment or TRICARE, what have you, and the FDA just is the approval process that then flows through to the government payor agencies. Is that correct? That is correct, Your Honor. FDA does not actually make the payments itself. And it's part of that attenuated chain that we're dealing with here, as highlighted by Judge Robinson, is that right? Exactly, Your Honor. And so the allegations... We can infer that the FDA knows allegations exist in the broad sense, but to go back to my colleague's question, are there any allegations from which we can reasonably infer, given the benefit of the doubt that we were supposed to with the complaint, that the FDA had actual knowledge of the specific CGMP violations with respect to which there was alleged noncompliance and misrepresentation? No, Your Honor. I wouldn't go that far, but I also don't think you have to go that far to find that the first Escobar materiality factor, which is the express payment condition, weighs in our favor. I think Mr. Yu has assumed throughout his arguments in this case that unless there is actual knowledge, you have to essentially ignore everything about the government's response or nonresponse to the alleged violations in the case. But this Court's decisions in Foreman and Strzok make clear that that is not true. The government's response is part of the plaintiff's pleading burden. So when it comes to, say, the second Escobar factor, which encompasses the way the government treats violations of this particular type, both in general and in the case at hand, this Court emphasized that it was significant that the plaintiff in Strzok did not allege that the government... There is an allegation about an audit in the complaint? There is an allegation that FDA inspected the Griffles plant in 2019 after the recalls. You like inspected, they like audited. Yes, Your Honor. But I don't think the term ultimately matters because, as Mr. Yu admitted in his opening brief, nothing is known or pled about the audit. So all you have to go off of there is just the mere fact that FDA inspected the plant, which is a completely unremarkable and routine occurrence. So that itself doesn't really establish any sort of... Well, certainly that's our view, Your Honor. Or at least there's no allegation that they found anything. That's exactly right, Your Honor. And at times, Mr. Yu has actually pointed to the inspection to suggest that it was a response to the alleged misconduct. But if you draw that inference, I think that even more strongly supports our position, precisely for the reason you just pointed out, Your Honor, because it would mean that FDA came in, inspected the plant, looked at the issues that Mr. Yu alleged, and apparently saw no problem because it took no further action. But what about the allegations of concealment, that there were forged records, that records were destroyed, were hidden about the clinical trials or the animal trials and other elements of maintenance and how the machines were treated? That wouldn't necessarily be apparent in a government visit, and it's some of those things that the plaintiff alleges were covered up and that would have resulted in adulteration and that invalidated in a way the inferences we otherwise would draw from the FDA approval. How do we deal with that? So certainly, Your Honor, I think it's fair to infer, drawing all the inferences in Mr. Yu's favor, that FDA would not necessarily have learned about all of those issues if it inspected, precisely for those reasons. As to the rabbit tests specifically, though, there are a couple of problems with Mr. Yu's theory there. I think he's pointing to those tests primarily to try to show what was present in Campy, the Ninth Circuit case, but which is absent here, which is an actual effect on the composition or effectiveness of the product itself that made it to patients. The problem is that the complaint does not support any link whatsoever between the validation issues that he alleges and the rabbit tests. The only allegation in the complaint that tries to draw a connection there is that Mr. Yu himself heard about the failed rabbit tests and became concerned that they likely reflected severe contamination. Your Honor, that is pure speculation. And this was not Mr. Yu's first attempt to plead this. This is his amended complaint. And Judge Woods did give him leave to replead if he wanted to, which he passed up. So I think you have to assume that this is the best that he can do in trying to link the validation issues that he's described to actual product impacts. I was trying to figure out whether the rabbit tests served as evidence of harm from these other allegations or whether they also served as yet another instance of alleged noncompliance or fraud on the part of Griffiths. Is it your position that it was only the former that was significant in the complaint? I think the complaint asserts both of those theories, Your Honor. But the second ultimately is a bit of a sideshow because under the third Escobar factor, for any of these claims to be material, ultimately Mr. Yu has to plead some kind of product impact. The third factor goes to the substantiality of the violations. In other words, did the government get the benefit of its bargain? Did it get what it was paying for? To use the example from Escobar, was this the equivalent of guns that don't shoot? And the rabbit tests were one of the two ways that Mr. Yu tried to establish that the Gamunex that made it to government health care beneficiaries was the equivalent of guns that don't shoot. So there was an allegation, and this is going to be sort of the allegation, about a valve that was supposed to be metal but it was plastic or vice versa. And there's actually an allegation that because of that it changes the currents that flow and creates a significant likelihood of, you know, that seems pretty specific and it seems to lay out the harm. How do we respond to an allegation like that? Your Honor, I think every allegation along those lines, in all of the subparagraphs of paragraph 112 in the complaint, do not rise beyond the level of speculation. So just to give you one example, this is JA 34, paragraph 112B. The validation failure could prevent the CIP systems from controlling the correct amount of chemical detergent, which in turn could affect the efficacy of the systems and result in an unsuccessful cleaning cycle for the IVIG equipment. And over time, the IVIG equipment could then become contaminated. That's two coulds and an over time. And every other allegation is essentially framed the same way. These are theoretical outcomes. And that all assumes that the rest of the validation process, about which Mr. Yu alleges absolutely nothing, does not catch any of these issues and that ongoing product testing by Griffles and FDA does not catch any issues either and the product then actually makes it to patients that is contaminated. And I think, if anything, the complaint's allegations on that score make that seem less plausible because the only actual patient impacts that Mr. Yu tries to identify are the two batches of Gamunex that were recalled, withdrawn in 2019. But there again, there is no plausible or particularized connection between the validation issues and the recalls. The complaint's only attempt to draw a link is to point to some unnamed former Griffles employee who heard about the recalls from somebody else and quote-unquote assumed that the recalls resulted from cross-contamination. Again, that is pure speculation and it is not enough. And that was in 2019, which was five full years after the validation issues supposedly occurred and five full years after the rabbit tests. So if Mr. Yu's theory were correct that all of these events are linked, that would mean that actual product contamination was occurring in 2014 and led to the rabbit tests. But if that's true, there would have been more recalls, there would have been more safety signals, there would have been impacts on patients certainly well before 2019 and it would not have been limited to the two small product batches that were recalled in 2019. Thank you. Thank you, Your Honor. Olivia, I hate to hit you right out of the box, but can I ask you to respond to your colleague's sort of opening statement that your argument about adulteration proves too much because it essentially raises your acknowledgement that not every CGMP violation is material? No, Your Honor. Yes, absolutely you can ask that question and I'll answer it. That's not what's happening here. You have to look, and Escobar says, right, it's a holistic analysis. You look at all of the allegations as you need to do on this standard as well. We are talking about the pleading stage. The complaint clearly alleges a variety. It's not one. We agree if the only allegation in the complaint was that Mr. Yu discovered that there was peeling tape, that would be a very different case, but that is not what we have here. We have a laundry list of violations that go into the careful calibration of this machinery that then produces a very sensitive drug for a very vulnerable patient population. It is with the inferences to the relator at this stage in the proceedings, this court cannot say that there isn't evidence in the record, that there aren't sufficient allegations to draw the conclusion that if CMS knew, if the government payee programs knew that this drug was being manufactured in an adulterated way, that that would not be material. Okay, but you can't simultaneously say Medicare does not pay if the drug is adulterated and acknowledging that a CGMP violation in a technical sense makes a drug adulterated,  Well, I guess what I would say is you don't have to reach that issue in this case because there is sufficient allegations to, again, giving the inferences to the relator to determine that there are sufficient allegations that would create a risk of patient harm, that would be serious enough for the healthcare agencies reimbursing for a very expensive drug to the tune of over $500 million in a two-year period alone is going to be material. So that's the issue. And just to briefly address a couple of the other points, this notion of knowledge, again, because there are no allegations, as my friend admits, in the complaint, that FDA or the healthcare agencies had actual knowledge, you cannot look at what they did as a result of having knowledge they didn't have. The continuation to pay cannot be a factor that you would look at with respect to materiality. Why isn't that so? I mean, this has been pending for four or five years, and there's no allegation that the FDA took any action. The FDA, I mean, if you look at the regs, which you can look at, the regs say there are all these different processes. The FDA can withdraw approval, it can send letters, notices, et cetera, and there's no allegation that any of that happened. Is it not a fair inference, then, that the government doesn't think this is material? It is not, Your Honor, because all of that assumes actual knowledge of the violation, not the allegations of the violation, but the violation itself. So the suit is filed five years ago with these serious allegations, and the government hasn't looked into it? Well, the Department of Justice looked into it, but you cannot impute actual knowledge to the FDA. The Department of Justice is going to look into it without consulting with the FDA? Does that make any sense? I appreciate what Your Honor is saying. It could be a fair conclusion that there was some consultation, but we have no information about what the FDA knew, and more to the point, we don't have any information about what the government agencies who are doing the reimbursing knew, and that's really the critical question for this court. Can you point to any other case in which the government refused to pay, in the first instance, for a drug based on the kind of noncompliance that you've alleged here? In the first instance, I don't know that the cases go that far, Your Honor, but we cite on pages 39 to 40 of our brief a number of cases that address this issue where the courts have held that a false claims case was certainly stated. No, I'm looking at something much more specific. Yes, no, I understand that, Your Honor. And so you can't point to any particular instance in which the CMS has stopped paying or the FDA has stopped approving based on the kind of allegations, on actual knowledge of the type that you're saying was absent here. Well, I do think that some of the cases that we cite in the papers do go that far, Your Honor. If you look at the Josie case, for example, that was a case where when the medical device company failed to follow protocols when administering a questionnaire for FDA approval, that plausibly stated a claim. So I think that case is very close on point to what Your Honor is asking about. Failure to administer a questionnaire. I'm sorry? Failure to administer a questionnaire. Yes, exactly, Your Honor. Okay, thank you. And then one other thing I would like to point out to the court's attention is paragraph 116. There's a lot of conversation by my friend about what did or did not happen again. All the inferences have to go to the relator in this instance. But that paragraph talks about how the vice president of research and development for Griffels testified at Mr. Yu's civil trial that there was a risk of patient harm if CG&P compliance was not met. Okay, thank you very much. Thank you, Your Honor. Appreciate it. We'll take it under advisement. Thank you both for your excellent arguments.